**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

LORENZO HOLCY,

        Plaintiff,

vs.                                                                Case No. 3:05-cv-1324-J-32HTS

FLAGLER COUNTY SHERIFF,

        Defendant.

## ORDER[1]

The undisputed facts of this case, which is before the Court on defendant's motion for summary judgment, reveal that at approximately 9:45 p.m. on the evening of October 24, 2001, a Walgreens pharmacy in Palm Coast, Florida, was robbed at gunpoint. A report of the crime was promptly circulated to the police, who were informed that the suspect, who stole drugs from the pharmacy, was a black male, approximately 5'4" tall, who was likely armed and had fled the crime scene on foot in the direction of Pine Cone Drive. Flagler County Sheriff's Sergeant Michael VanBuren, an officer with 14 years of experience with the Sheriff's Office, was among those who responded to the call. Within minutes, VanBuren came upon plaintiff Lorenzo Holcy, an African-American man who stands approximately 5'8" tall, as Holcy, who was alone, was entering or had just entered his car in a post office parking lot on Pine Cone Drive near the Walgreens. VanBuren stopped Holcy, directed him to move away from the car and held him at gunpoint until backup officers arrived. VanBuren

---

[1]Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

or another officer then placed Holcy in handcuffs behind his back and held him there until a Walgreens employee arrived at the scene and reported that Holcy was not the robber. During the course of the detention Holcy told the deputies that he was a corrections officer and his identification confirmed this. Meanwhile, the officers had also learned that the Walgreens robber was now reported to be Hispanic, not African-American. Officers then removed the handcuffs and released Holcy.

Holcy estimates that he was detained in handcuffs for 45 minutes or an hour, although he further testified that once officers stopped him and conducted a pat-down search, they spent 10-15 minutes searching his car, following which the Walgreens employee determined that Holcy was not the suspect and he was released. See Doc. 24-2 (transcript of plaintiff's deposition) at 78, 81-83; Doc. 21-5 (plaintiff's affidavit) at ¶ 14. Holcy further states that he told officers on more than one occasion during the detention that the handcuffs were too tight but that officers checked the cuffs and declined to loosen them. Doc. 24-2 at 78. The Flagler County Sheriff's dispatch records show that the call from the Walgreens came in at 9:47 p.m., that at 9:50 p.m. a vehicle tag number records request was received, at 9:54 p.m. deputies identified their position at the post office, at 9:56 p.m. a person was secured at the post office location, at 10:02 p.m. a warrants check request was received for Lorenzo Holcy, at 10:05 p.m. a Walgreens employee was being returned to the Walgreens after being brought to the post office location, and at 10:08 p.m. the deputies who responded to the post office location where Holcy was detained were returning to the Walgreens. See Doc. 14, Exhibit 2 (computer record attached to affidavit of Lisa Nesbitt, Flagler County Sheriff's dispatch/communications officer). VanBuren testified that he did not recall Holcy

complaining about the handcuffs. Doc. 21-2 at 28.

Holcy claims that he suffered injuries to his left wrist as a result of the handcuffs being too tight and he has sued the Sheriff in a four count complaint, alleging that the Sheriff is liable pursuant to 42 U.S.C. § 1983 and Article I, § 12 of the Florida Constitution for violating Holcy's Fourth and Fourteenth amendment rights by detaining and searching Holcy without cause and in a manner which caused him injuries (Count I); that the Sheriff is liable for negligence because the Sergeant breached a duty to ensure that the handcuffs were properly secured without causing injury (Count II); that the Sheriff falsely imprisoned Holcy when officers held him for an estimated 45 minutes to an hour without reasonable or probable cause (Count IV[2]); and that the Sheriff committed a battery by restraining Holcy with handcuffs in a manner which caused him physical injuries (Count V). The Sheriff has now moved for summary judgment on all counts (Doc. 13). Holcy has filed a response in opposition (Doc. 21). Both parties filed evidentiary support for their positions. See Docs. 14, 24 and attachments to Doc. 21.

## I. Standard of Review

When ruling on motions for summary judgment, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." McCormick v. City of Fort

---

[2]There is no Count III.

Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003).  Summary judgment should only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1279-80 (11th Cir. 2004) (citing Fed. R. Civ. P. Rule 56(c)).  In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment is due to be granted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  In deciding a motion for summary judgment by a defendant, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).  "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'"  Id. (quoting Anderson, 477 U.S. at 249-50) (emphasis in original).

**II.  Discussion**

A.  Count I:  42 U.S.C. § 1983 and Florida constitutional claim

Plaintiff has sued the Sheriff in his official capacity[3] alleging that the Sheriff has an unconstitutional policy of detaining suspects thought to have committed violent crimes until such suspects are ruled out as perpetrators by eyewitnesses.  Plaintiff claims such policy fails to account for a citizen's constitutional right to be free from government seizure and that officer safety is easily ensured by use of pat down searches, weapons searches, and other investigative techniques, without the need for continued handcuffing of suspects.[4]  However, "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."  Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir.

---

[3]Plaintiff's complaint names the "Flagler County Sheriff" as the sole defendant without stating whether the Sheriff is sued in his individual or official capacity.  However, because plaintiff has not alleged that the Sheriff himself (who, on October 24, 2001, was James Manfre), had any personal role in the relevant events here and because plaintiff's response to the summary judgment motion does not contradict the Sheriff's position that this is an official capacity suit only, the Court likewise assumes that it is.  On the facts of this case, however, the outcome would not be different if the Sheriff had been sued in his individual capacity.

[4]This articulation of plaintiff's § 1983 claim, raised in his response to the summary judgment motion (Doc. 21 at 14), is only vaguely asserted in his complaint. See Doc. 2 at ¶ 17 (A) (seeking to enjoin the Sheriff from engaging in "continuing, unlawful practices").  The remainder of the Count I allegations appear to be an attempt to hold the Sheriff liable for the actions of Sergeant VanBuren.  Because the Sheriff cannot be held liable under § 1983 on a theory of respondeat superior, those allegations do not support a claim for relief.  See Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978); Eleventh Circuit Pattern Jury Instruction 1.10.1 (2005); Engelleiter v. Brevard County Sheriff's Dept., 290 F.Supp.2d 1300, 1308-09 (M.D. Fla. 2003).  To the extent plaintiff is arguing that officers applied excessive force in their use of handcuffs, plaintiff has not suggested that any Sheriff's policy caused officers to use excessive force or that the Sheriff failed to train or supervise his deputies and relief is therefore not available under Count I (the officers' use of handcuffs is revisited in the discussion below regarding Counts II and IV).

1996). See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); see also Hutton v. Strickland, 919 F.2d 1531, 1542-43 (11th Cir. 1990) (noting that for § 1983 actions, Florida sheriffs are county officials, not state officials; thus "in all respects other than name," official capacity suits against Florida sheriffs are "to be treated as [suits] against the government entity and the law governing the liability of the government entity under section 1983 determines the liability of the particular official") (citation omitted); Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978) (holding that government entity has responsibility under § 1983 only where the execution of a government's policy or custom . . . inflicts the injury).

In this case, it is undisputed that Sergeant VanBuren arrived at the post office parking lot while responding to a police call regarding an armed robbery that had just occurred at the Walgreens pharmacy down the block and from which a suspect was last seen fleeing on foot, likely while armed and carrying stolen prescription drugs. VanBuren testified that the Walgreens and the post office are connected by an alley containing several dumpsters into which a suspect could have tossed any identifiable articles of clothing and that the post office lot would be a perfect location to park a get-away car. VanBuren testified that Holcy was the first person he came upon who met the description of a black male in the vicinity of the crime and that Holcy's car was the only one in the post office parking lot that VanBuren did not recognize as one that is usually parked there at night. Although Holcy testified that other persons were in the post office lobby (which is open all night), he did not offer any testimony

contradicting VanBuren's regarding other cars that were in the parking lot at the time Holcy was initially stopped.  Under the circumstances here, VanBuren had reasonable suspicion upon which to stop, detain, and handcuff Holcy.  Graham v. Connor, 490 U.S. 386, 396 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it."); United States v. Hastamorir, 881 F.2d 1551, 1556-57 (11th Cir. 1989) (holding that handcuffing of suspect during Terry stop was "reasonable action designed to provide for the safety of the agents" where agents "reasonably believed that the men presented a potential threat to their safety"); United States v. Aldridge, 719 F.2d 368, 372 (11th Cir. 1983) (noting particular danger to police officers when an investigative detention involves a suspect in a vehicle); Terry v. Ohio, 392 U.S. 1, 24 (1968) (holding that officer may conduct investigatory stop upon reasonable suspicion even where probable cause for an arrest is absent).  Even Mr. Holcy, a trained corrections officer himself, testified that officers can stop, detain, and handcuff a person suspected of having been recently involved in a violent crime.  Doc. 24 at 96.

Both VanBuren and Sheriff Manfre testified that when an officer encounters a possible suspect when responding to a violent crime such as an armed robbery, the first priority is to ensure the safety of the officer and the public.  This is effected by taking a position of cover and holding a suspect until backup can arrive.  A suspect is then physically restrained and the scene is secured before further efforts are made to determine whether the detained individual is likely the actual perpetrator of the crime.  VanBuren and another responding deputy both testified that restraining a suspect using handcuffs behind a person's back is the

preferred method when dealing with a person suspected of having committed a violent felony because handcuffs in the front could be used to strike an officer or to access front pockets where a weapon could be concealed. Manfre testified that keeping a possible violent felony suspect in handcuffs is essential to ensuring officer safety, particularly when the encounter occurs in a public area. Manfre testified that once a suspect is physically secured, an officer uses discretion based on the circumstances to determine how to proceed thereafter. Sometimes officers will ask for the radioed description to be repeated so that identifying characteristics such as weight, height, race, and other marks, can be confirmed, but sometimes such details are not as refined as necessary to make a positive identification and other times such details are inaccurate. The preferred method of identification, according to Manfre, is to have a crime witness, whose memory is likely to be fresh, actually view the suspect to confirm whether he or she is the likely perpetrator.

Holcy's contention is that once he produced identification and officers learned that he was a corrections officer and verified that there were no outstanding warrants against him, the Sheriff's officers, who had already conducted a pat-down search which uncovered no weapons, should have immediately uncuffed Holcy rather than waiting until a witness could come to the scene to identify whether he was in fact the perpetrator. This, in effect, is an argument that the initial Terry stop ripened into an arrest for which the officers had no probable cause.[5] Holcy also suggests that officers had other means available to dispel any

---

[5]Although Holcy has made vague allegations in his interrogatory answers (see Doc. 14 at #22) that he believed he was singled out as a suspect because he was a black male, the uncontroverted fact is that the initial radio report upon which VanBuren was acting when he stopped Holcy stated that the suspect *was* a black male. Moreover, Holcy's Count I § 1983

8

notion that he was the robber, such as going to the Walgreens to review any videotape of the incident.  Although VanBuren could not recall when he learned that Holcy was a corrections officer, he testified that his general reaction to such knowledge would be that such a suspect may be even more dangerous than a non-law enforcement individual because law enforcement officers are more likely to be carrying weapons.  Doc. 21-2 at 38.

To determine whether a Terry stop has exceeded its lawful bounds to become an arrest for which probable cause is required, the Court considers "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention."  United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) (citations and quotations omitted).  In evaluating the first factor, the "most important consideration is whether the police detained the [suspect] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference."  Id. (citations and quotations omitted).  To address the second factor, the Court asks "whether the police were diligent in pursuing their investigation."  Id. (quotation omitted).  In other words, did "[e]ach investigatory act logically [lead] to the next act which was done without delay."  Id.  The next inquiry is "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety," which is addressed by considering whether officers can articulate an objectively reasonable basis

---

claim is that the Sheriff has a policy of detaining individuals in handcuffs until they can be ruled in or out as suspects by a witness, which alleged policy has nothing to do with a suspect's race or gender.

upon which they believed the suspect was potentially dangerous, such as would justify taking measures such as drawing a weapon, placing a suspect in handcuffs, ordering a suspect to lie face down on the ground, or securing a suspect in the back of a patrol car. Id. at 1146-47. Finally, as to the duration of detention, although "[t]here is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop," the Court considers both the cause for the stop in relation to the duration of the stop, and whether police were diligently investigating to quickly confirm or dispel their suspicion. Id. at 1147.  Here, there is no dispute that VanBuren lawfully stopped Holcy in response to a police bulletin that a short black male suspect had just stolen drugs at gunpoint from a nearby pharmacy and was last seen fleeing on foot toward the place where VanBuren was now located and where VanBuren observed plaintiff entering a car parked in a fairly deserted post office parking lot at night. Once Holcy was stopped on that basis, his continued detention involved securing the safety of the scene by conducting a pat down search of Holcy and his car for weapons, handcuffing Holcy to prevent his accessing a weapon or escaping, and requesting his identification so that a records check could be run. Meanwhile, because there were eyewitnesses to the robbery who were still at the nearby scene of the crime, at least one of those witnesses was then escorted to the post office parking lot where Holcy was being held.

Although the officers learned that an update to the description of the suspect stated that the suspect was Hispanic, not black, and officers also learned that Holcy was a corrections officer, neither of these facts, alone or together, would require the officers to immediately release Holcy from custody. First, as VanBuren testified, the knowledge that Holcy was a corrections officer would have strengthened VanBuren's concern that Holcy

actually was carrying a weapon.  Second, as VanBuren further testified, in his experience, victims who have been subjected to crimes that have put them in fear, such as an armed robbery, are not always accurate in their descriptions of a suspect.  Thus, police are reluctant to release a plausible suspect too soon because, as VanBuren testified, officers "only get one opportunity to check out a possible suspect that's in the area.  Generally, if you discount and take off looking for somebody else, you never see that individual again."  Doc. 21-2 at 37.  Additionally, VanBuren testified that once the post office scene was secure, the witnesses from Walgreens were called to come to the scene to identify Holcy.  Holcy himself testified that no more than 10-15 minutes lapsed between the time his car was searched and the time a witness arrived from the Walgreens.  During the detention, Holcy was not taken to any other location, he was not placed in a police car, and he has not alleged that he was impermissibly interrogated.  Holcy's own testimony supports the conclusion that, even if the detention lasted for an entire hour (as Holcy has estimated),[6] the investigation rapidly progressed from the initial stages where the officers worked to ensure the safety of the public and themselves in response to a possible armed suspect who had just stolen drugs at gunpoint, to the investigatory phase where officers promptly brought witnesses to the scene who stated that Holcy was not the robber, whereupon he was promptly released.  See Muehler v. Mena, 544 U.S. 93, 100 (2005) (holding that 2-3 hour handcuff detention was

---

[6]The police computer records, VanBuren's testimony and much of Holcy's own testimony support a finding that the length of time Holcy was handcuffed was far, far shorter than the 45 minutes to an hour that Holcy claims.  However, the Court need not resolve this disputed fact because it finds that even if Holcy was handcuffed for an hour, the duration of the handcuffed detention was reasonable and appropriate to the circumstances facing the officers.

reasonable where officers executing search warrant for weapons faced possible danger).

Were the Court to find that the knowledge of the changed description of the suspect or of Holcy's occupation should have led the officers to immediately release Holcy, the Court would be engaging in "unrealistic second-guessing" of the actions of the trained officers, who themselves were responding "in a swiftly developing situation." United States v. Sharpe, 470 U.S. 675, 686-87 (1985) (cautioning judges against improperly imagining "alternative means" by which police objectives might be accomplished).  On the facts of this case, the Court holds as a matter of law that no constitutional violation was visited upon Holcy by the officers' failure to release him from handcuffs any earlier than they did.[7]  Thus, the Court does not reach the question of the constitutionality of the Sheriff's alleged policy of restraining all suspects in handcuffs until witnesses confirm or dispel the identity of the suspect as the perpetrator.  Holcy's claim pursuant to 42 U.S.C. § 1983 fails as a matter of law.

To the extent plaintiff seeks relief in Count I under Article I, section 12 of the Florida Constitution (which, pursuant to its own terms, is to be construed in conformity with the Fourth Amendment to the United States Constitution), the Court finds such avenue is likewise unavailing.  Florida constitutional claims do not support claims for damages absent a separate enabling statute, see Garcia v. Reyes, 697 So. 2d 549 (Fla. 4th DCA 1997), and plaintiff has cited no statute providing such relief here and the Court is likewise aware of none (and plaintiff essentially concedes this point, see Doc. 21 at 17, first full paragraph). Further, as the Court has found above that plaintiff suffered no Fourth Amendment violation,

---

[7]Holcy's contention that the handcuffs were used in a manner that caused him injury is addressed below in the discussion of his state law claims.

his allegation that a policy of the Sheriff caused a violation of his constitutional rights fails; thus, his Florida constitutional claim would not provide any basis for relief.

Summary judgment is due to be granted to defendant on Count I.

B. Count II:  Negligence

In plaintiff's negligence claim, Count II, plaintiff alleges that the Sheriff breached a duty to ensure that handcuffs were properly placed on plaintiff during the October 24, 2001 detention.  In his opposition brief, plaintiff states that defendant has not moved for summary judgment on this claim.  However, defendant's motion states that he is seeking judgment on "all claims" (Doc. 13 at 25) and indeed, defendant's arguments as to Counts IV and V (the state law claims for false imprisonment and battery) apply to the allegations raised in Count II.

Although VanBuren had no particular recollection of Holcy having complained about the handcuffs, he testified that handcuffs are not designed to be comfortable as they are intended to restrain an individual to prevent him from being able to have use of his arms and hands.  Doc. 21-2 at 34.  He further testified that his usual practice with handcuffing is to ensure that there is space between the wrists and the cuffs, but that handcuffs must be secured tightly enough that a hand cannot slip out. Doc. 21-2 at 34-35.  Deputies testified that once handcuffs are in place, they are locked in a manner so that they do not become tighter.  Doc. 21-3 at 18.  Testimony from deputies and the Sheriff explains that the use of handcuffs behind the back is a necessary procedure when investigating a violent felony such as an armed robbery because the suspect might otherwise access a weapon from a front pocket or use the handcuffs to strike an officer if cuffed in the front.  They further testified

13

that there is a particular concern for escape and danger where the detention is occurring in a public area where the risk of escape is greatest.  See, e.g., Doc. 21-2 at 15; Doc. 21-3 at 11; Doc. 21-4 at 9.  Holcy has not contradicted any of this testimony and in fact he has testified that he told officers on more than one occasion that the handcuffs were too tight, and that although officers refused to remove the handcuffs, they did check them and said they were fine. Doc.  24 at 78; 21-5 at ¶ 12.  Holcy further testified that once the deputies removed the handcuffs he did not say anything about the handcuffs or injuries to his wrists because he thought he was all right and he "probably would have stopped most of . . . this" if the officer "would have apologized."  Doc. 14 at 84.

Construing all facts in a light most favorable to plaintiff, the Court cannot find that the officers acted outside the permissible bounds of Florida Statute section 776.05(1), which sanctions an officer's use of force as reasonably necessary to protect officers and the public from harm.[8]  Summary judgment is therefore granted as to Count II.

C.  Count IV: False Imprisonment

Under Florida law, false imprisonment is "the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty."  Geidel v. City of Bradenton Beach, 56 F.Supp. 2d 1359, 1367 (M.D. Fla. 1999) (quoting Johnson v. Weiner, 19 So. 2d 699, 700 (Fla. 1944)).  Officers who have probable cause to detain a person suspected of committing a crime have a complete

---

[8] To the extent plaintiff has argued that officers acted in bad faith or with malice in their use of handcuffs, such claim would be barred by Fla.Stat. § 768.28(9)(a), which bars suits against the Sheriff for willful acts of his deputies.

defense to a subsequent false imprisonment claim. Grix v. Florida Fish and Wildlife Conservation Com'n, 821 So. 2d 315, 316 (Fla. 4th DCA 2002); Johnson v. Barnes & Noble Booksellers, Inc., 437 F.3d 1112, 1116 (11th Cir. 2006) (stating that defendant may challenge false imprisonment claim "by asserting the lawfulness of the detention"). Florida law permits law enforcement officers to temporarily detain a person upon founded or reasonable suspicion of criminal activity, Fla. Stat. section 901.151, including in response to a BOLO (a "be on the lookout" alert). Hunter v. State, 660 So. 2d 244, 249 (Fla. 1995) (holding officers' suspicion was reasonable where stop supported by BOLO information regarding the length of time and distance from the offense, the route of flight, the specificity of the description, and the source of the BOLO information). As explained above in the Court's analysis of Count I, the officers lawfully detained Holcy in response to the report of the armed robbery at the Walgreens, which presents a complete defense to this false imprisonment claim; defendant is therefore due to be granted summary judgment on Count IV.

D.  Count V:  Battery

Plaintiff seeks to hold the Sheriff liable in Count V for battery alleging that the officers' use of handcuffs resulted in a battery. As explained above in the analysis of Count II, the Court finds as a matter of law that the deputies' use of handcuffs here did not exceed the permissible bounds of force such as is reasonably necessary to protect officers and the public from harm. Fla. Stat. § 776.05(1). Summary judgment is due to be granted on Count V as well.

### III.  Conclusion

Accordingly, for the reasons stated, it is hereby

**ORDERED**:

Defendant's Motion for Summary Judgment (Doc. 13) is **GRANTED**.  The Clerk shall enter judgment in favor of defendant and against plaintiff and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 6th day of September, 2007.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record